# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KENNETH L. MOTEN,

        Plaintiff,

vs.                                  CASE NO. 3:10-cv-882-J-37TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

## REPORT AND RECOMMENDATION[1]

This matter is before the Court on Plaintiff's Complaint (Doc. #1), which seeks review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff filed his Brief in support of the appeal of the Commissioner's Decision (Doc. #14), and Defendant filed his Memorandum in Support of the Commissioner's Decision (Doc. #19). The Commissioner has filed the transcript of the underlying administrative record and proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

The undersigned has reviewed the record and has given it due consideration in its

---

[1] Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation. Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); and, Local Rule 6.02(a), United States District Court for the Middle District of Florida.

entirety, including arguments presented by the parties in their briefs and materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the Court in making its determinations. Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, the undersigned **RECOMMENDS the Commissioner's decision be AFFIRMED**.

## I. PROCEDURAL HISTORY

In the instant action, Plaintiff protectively filed an application for disability insurance benefits ("DIB") on July 22, 2003, with an alleged onset date of February 17, 2000 (Tr. 98-100). Plaintiff's application was denied initially, and upon reconsideration. (Tr. 53-54, 56-59, 67-69). After an administrative hearing, the administrative law judge ("ALJ") issued an unfavorable decision on December 30, 2005. (Tr. 459-67). Plaintiff filed a request for review (Tr. 472), and the Appeals Council remanded the case for further proceedings on November 14, 2006 (Tr. 490). On May 21, 2008, Plaintiff filed an application for social security income ("SSI"), which was escalated to the hearing level. (Tr. 35). On remand, the ALJ held an administrative hearing on February 21, 2008 and considered both applications (Tr. 652). The ALJ issued an unfavorable decision on July 5, 2008. (Tr. 32-45). The Appeals Council denied Plaintiff's request for review on July 30, 2010. (Tr. 6-9).

Plaintiff filed the instant action in federal court on September 24, 2010, requesting that this Court reverse and set aside the decision of the Commissioner, or remand for a *de novo* hearing (Doc. #1).

## II. BACKGROUND

### A. Summary of Evidence Before the ALJ

Plaintiff was born on December 11, 1965, and was forty-two years of age at the time of the ALJ's decision. (Tr. 98, 685). Plaintiff completed high school (Tr. 685), and has past relevant work experience as a tractor trailer driver, construction worker, and garbage collection driver. (Tr. 687-88, 708-09). Plaintiff's medical history was discussed in the ALJ's decision and will be summarized herein.

#### i. Medical Evidence

Plaintiff was injured in a pedestrian motor vehicle accident on February 17, 2000 when he was struck by a truck while working as a garbage collector. (Tr. 280) He sustained multiple injuries to his hip, leg, and ankle. *Id.* Records from Halifax Medical Center reveal Plaintiff was hospitalized from February 17, 2000 through March 2, 2000, where he received surgery for multiple fractures, including pelvic fracture, acetabulum[2] fracture, and severe open tibia and fibular fracture. (Tr. 280-343).

Plaintiff's claims for disability stem from his injuries sustained in accident. The medical records below are presented in chronological order and reflect Plaintiff's treatment following the accident. Plaintiff's treating physician indicated in his records that Plaintiff was unable to work until August 2000. From that time onward, Plaintiff's treating physician consistently cleared Plaintiff for sedentary work, except for a short period of time around a follow-up surgical procedure.

---

[2] Acetabulum is defined as a "cup-shaped depression on the external surface of the hip bone, with which the head of the femur articulates." *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 15, 2012).

Beginning in March of 2000 through June 2003, Plaintiff visited Dr. James M. Bryan monthly at the Orthopaedic Clinic of Daytona Beach. (Tr. 353-90). On March 7, 2000, three weeks after Plaintiff's last operation, Dr. Bryan noted Plaintiff's pelvis demonstrated good alignment of the bone and internal fixation. (Tr. 390). The left distal tibial shaft also demonstrated good alignment of the bone and internal fixation of the tibial shaft and the ankle fracture. *Id.* Dr. Bryan found Plaintiff's work status was "unable to work." (Tr. 389). Dr. Bryan noted the same findings on March 21, 2000. (Tr. 388). On April 18, 2000, Dr. Bryan found good alignment of the pelvis bone and left ankle, healing of the acetabular fracture, and good range of motion of the hip. (Tr. 387). Three months after the accident, on May 16, 2000, Dr. Bryan noted Plaintiff had made "good progress in all areas." (Tr. 386). The pelvis was stable, with good range of motion, and the hip joint was well preserved. (Tr. 385). The shaft fracture of the left tibia was well aligned. *Id.* Joint space in the left ankle was well preserved. *Id.* Foot range of motion was decreased. *Id.* One month later, Dr. Bryan noted Plaintiff had deformity in his left foot, which was pulling up at the toes. (Tr. 384). Physical examination revealed the right hip range of motion was good, and neurologic function of the right lower extremity was good. *Id.* The pelvis continued to demonstrate good alignment of the bone and internal fixation, and the hip joint was well preserved. *Id.* With regards to the left ankle, the mortise[3] was preserved and the fracture continued to show good signs of healing. *Id.*

In July 2000, Dr. Bryan noted deformity in Plaintiff's left foot, but noted his strength

---

[3] Mortise is defined as "the seating for the talus formed by the union of the distal fibula and the tibia at the ankle joint." *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 15, 2012).

4

was "much improved from prior examinations." (Tr. 382). The hip joint was still well preserved. *Id.* The internal fixation of the left tibia was in place, and there was evidence of healing, but the fracture lines were still present. *Id.* Dr. Bryan noted Plaintiff had a high change of developing a nonunion[4] in his tibia and might require revision surgery. (Tr. 381).

In August 2000, Plaintiff returned for reevaluation, complaining of back pain and left foot deformity. *Id.* Radiographs revealed disc spaces of the lumbar spine were well preserved with the exception of mild narrowing of L5-S1. (Tr. 380). There was no evidence of bony abnormality, spondylosis or spondylolisthesis, and Dr. Bryan found an "[e]ssentially normal study." *Id.* Plaintiff's foot had some "mild malalignment" but the range of motion was good. *Id.* Radiographs of the left tibia showed one major fracture line still visible, but it looked like there was callus bridging in that area, and no obvious nonunion had occurred at that time. *Id.* The ankle mortise was preserved. *Id.* Dr. Bryan reported Plaintiff was capable of doing sedentary work with no driving. *Id.* Dr. Bryan recommended Plaintiff wean from the crutches and the fracture walker, and gave him a prescription for a cane. *Id.* Dr. Bryan noted Plaintiff had been dependent on his sister for attendant care from March 2000 to May 2000, but Dr. Bryan believed from May 2000 to August 2000, Plaintiff only required attendant care one hour per day to assist with activities of daily living. (Tr. 378-79).

In September 2000, Dr. Bryan noted Plaintiff's hip was doing "real well." (Tr. 378). Plaintiff complained of pain in his left ankle, knee, and back. *Id.* Physical examination

---

[4] A nonunion is defined as the "failure of normal healing of a fractured bone." *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 15, 2012).

revealed good range of motion of the hip, the knee examination was benign, and the ankle range of motion was good with no significant crepitation, evidence of infection or increased warmth. *Id.* Radiographs of the left ankle revealed no obvious nonunion in the left ankle but there were prominent plates. *Id.* The fibula appeared to be "well healed." *Id.* Radiographs of the pelvis showed the hip joint space was well preserved, an abundant callus across from the fracture site was doing "very well." *Id.* Dr. Bryan assessed the left hip acetabulum as "doing very well" and the left tibia as "delayed union." *Id.* Dr. Bryan noted Plaintiff may need surgery but there was a possibility he could heal the delayed union with the use of an EBI bone stimulator. *Id.* Dr. Bryan recommended Plaintiff's work status be "light duty, sedentary work only, no driving." *Id.* Plaintiff was fitted by an EBI bone stimulator two weeks later and was told to follow up in a month. *Id.*

In October 2000, physical examination revealed negative straight leg raise, good range of motion in the hip, and mild weakness in the right foot. (Tr. 377). The left leg at the foot showed some valgus deformity and palpable callus laterally. *Id.* The ankle range of motion was good, and neuro examination was intact. *Id.* Radiographs of the left ankle revealed "joints with minimal signs of arthritic change" and the malleolus fracture appeared to be healing nicely. *Id.* Radiographs of the tibia revealed the fibular to have healed nicely, but there was still some fracture lines consistent with delayed union. *Id.* Dr. Bryan noted Plaintiff would continue on sedentary work status for two months. (Tr. 376).

In December 2000, Plaintiff complained of pain in both knees. *Id.* Physical examination revealed good range of motion of the lower extremities. (Tr. 375). Radiographs of the left ankle demonstrated continued healing at some of the fracture fragments, although there was still a question of possible nonunion present in the distal

tibia. *Id.* Dr. Bryan stated Plaintiff's work status remained sedentary work only. *Id.*

In March 2001, Plaintiff complained of pain in his lower back, right hip, both knees, left lower leg and ankle, and left foot. (Tr. 374). Radiographs revealed normal alignment and architecture of the right ankle and the joint space was well preserved. *Id.* The left tibia showed internal fixation in place, the fracture appeared to be healed, the ankle mortise was preserved and the overall alignment looked good. *Id.* The right knee showed normal bony architecture and alignment, with no abnormalities. (Tr. 374-73). The pelvis was well aligned and the hip joint space was well preserved. (Tr. 373). The bony architecture and alignment of the lumbar spine appeared normal, with disc height well preserved and no abnormalities. *Id.* Bony changes about the right sacroiliac joint were noted, and found to be consistent with the pelvic fracture with injury to the sacroiliac joint. *Id.* Dr. Bryan believed Plaintiff's right knee pain was the result of a torn ACL and ordered an MRI, which confirmed that. (Tr. 371-73). With regards to the pain associated with the left ankle and leg, Dr. Bryan noted, "It is possible there is a nonunion that is not recognized but with the prominence of the hardware and ongoing pain, I lean towards removal of the hardware. . ." *Id.* Plaintiff's work status remained sedentary work only. *Id.*

In April 2001, Plaintiff underwent hardware removal procedure, and his work status changed to unable to work. (Tr. 370-71). In May 2001, Plaintiff complained of continued instability in his right knee. (Tr. 369). Dr. Bryan noted his left tibia and ankle fracture were "doing well." *Id.* His work status was upgraded to sedentary work only. (Tr. 368). In July 2001, radiographs of the left tibia did not show any obvious nonunion. *Id.* Plaintiff was told to continue using a cane and his work status was sedentary. (Tr. 367).

In September 2001, physical examination revealed good range of motion in the right

wrist, with no crepitation. (Tr. 366). Radiographs of the left tibia showed the fracture site continued to show "progressive improvement." *Id.* The posterior portals and cortex were intact, although anteriorly "the cortex still has a nonunion present." *Id.* Dr. Bryan assessed Plaintiff's condition as "[i]mproving." *Id.* Dr. Bryan recommended Plaintiff continue to use the EBI bone stimulator on his left tibia for another four months. *Id.* With regards to Plaintiff's right knee, Dr. Bryan noted he did not believe surgery was required at that time because Plaintiff had not been having "a lot of symptomatic giving way of this knee." *Id.* However, Dr. Bryan noted "as the left tibia heals more and he becomes more mobile then maybe the knee is going to become more symptomatic and possibly it would require surgery." *Id.* Plaintiff's work status remained sedentary only, and Dr. Bryan noted, "I do think he should be going through vocational rehabilitation for sedentary work." *Id.*

In January 2002, Plaintiff complained of pain in his lower back, right hand, and left foot, and weakness in his right knee and ankle. (Tr. 365). Physical examination showed good range of motion in the right hip; marked instability in the right knee; good range of motion and strength in right ankle; and the foot had mild residual deformity. *Id.* Radiographs showed the left tibia continued to show signs of healing and the overall alignment looked "very good." *Id.* The pelvis showed good alignment with preserved acetabular joint space and mild arthritic changes. *Id.* Plaintiff's work status remained sedentary. (Tr. 364). At the end of January, Plaintiff reported he had taken the boot off his foot, which improved the stability of his right leg and right knee. (Tr. 363). An MRI did not show any major neurological impairment. *Id.* When Plaintiff complained of spasms in his right hand, Dr. Bryan recommended he switch to his left hand when using his cane. *Id.*

In April 2002, physical examination revealed decreased range of motion in the right

hip. (Tr. 362). The right knee showed ACL instability, with some discomfort and an acceptable range of motion. *Id.* The right ankle and foot were benign. *Id.* The left ankle showed decreased range of motion with tenderness. *Id.* The left foot showed deformity and decreased range of motion. *Id.* Radiographs of the left tibia showed the distal tibia and fibula were well healed, and there was an abundant callus "consistent with healing delayed union." *Id.* Dr. Bryan noted Plaintiff was "plateauing." (Tr. 361). Dr. Bryan stated treatment for residual deformity in the left foot was not indicated, and Plaintiff did not require surgery for the right knee ACL tear. *Id.* Dr. Bryan noted the left tibia continued to heal. *Id.* Dr. Bryan also noted Plaintiff had a thirty percent chance of requiring a right total hip arthroplasty within three years, and calculated Plaintiff had a twenty percent whole body impairment rating. *Id.* Plaintiff's work status was permanent light duty. *Id.*

In August 2002, Plaintiff returned to Dr. Bryan complaining of pain in his lower back and left knee. (Tr. 360). Radiographs of the left knee showed normal bony architecture and alignment, with no abnormalities. *Id.* Physical examination showed tenderness in the lower lumbar spine; negative straight leg raise; and stable ligamentous examination in the left knee. *Id.* Dr. Bryan noted Plaintiff was at his maximum medical improvement. (Tr. 359).

In January 2003, Plaintiff returned to Dr. Bryan complaining of pain in his lower back and left leg, and weakness in his right knee. *Id.* Physical examination revealed good range of motion in both hips; marked instability in the right knee, which required a cane for ambulation; stability in the left knee; and there was residual deformity of the left foot. (Tr. 358-59). Dr. Bryan recommended a home exercise program. (Tr. 358). Dr. Bryan stated Plaintiff was at "maximum medical improvement with permanent light duty work status of

sedentary work only." *Id.*

In June 2003, Plaintiff returned to Dr. Bryan complaining of pain in his lower back, right hip, left leg and ankle, and instability in his right knee. (Tr. 357). Physical examination revealed marked instability in the right knee, with good range of motion in the hips and left ankle. *Id.* Radiographs showed normal bony architecture and alignment in the lumbar spine with disc heights well preserved. *Id.* The pelvis showed mild osteoarthritic change about the right hip, but the acetabulum fracture was well healed. *Id.* The left tibia showed good alignment, and no nonunion was identified. *Id.* The left ankle joint was preserved with some mild arthritic change. *Id.* Dr. Bryan recommended continuation of conservative management and for Plaintiff to try to exercise the joints as much as possible. (Tr. 356).

On July 30, 2003, a Department on Disability Services ("DDS") physician completed a Residual Functional Capacity Assessment and made the following findings: Plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; had unlimited push and/or pull; could occasionally climb, balance, stoop, kneel, crouch, or crawl; and must avoid concentrated exposure to hazards. (Tr. 444-50).

On September 2, 2003, a DDS physician completed a second Residual Functional Capacity Assessment and made the following findings: Plaintiff could occasionally lift and/or carry ten pounds and frequently lift and/or carry less than ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; had unlimited push and/or pull; could never climb, balance, stoop, kneel, crouch, or crawl; and must avoid concentrated exposure to vibration and hazards. (Tr. 429-37).

10

On October 20, 2003, Dr. James Shoemaker completed a consultative examination. Upper extremities showed full range of motion, with grip strengths 5/5 bilaterally and fine manipulation within normal limits. (Tr. 439). Lower extremities showed decreased range of motion at the hips and left ankle. *Id.* Dr. Shoemaker noted Plaintiff's gait was abnormal with and without the cane. *Id.* Straight leg raises were positive on the right at thirty degrees and negative on the left. *Id.*

On April 14, 2005, Dr. Bryan completed a Medical Assessment of Ability to do Work-Related Activities (Physical) (Tr. 452-55). Dr. Bryan found Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally. (Tr. 452). He could carry up to twenty pounds occasionally. (Tr. 453). Dr. Bryan stated his opinion was based on "consistent findings on physical exams" and noted Plaintiff was a "multiple trauma injury patient." *Id.* Dr. Bryan found Plaintiff could sit six hours in a workday, stand for two hours, and walk for one hour. *Id.* Dr. Bryan based this opinion on "radiographic evidence of past traumatic hip, ankle, and foot arthritis." *Id.* Dr. Bryan found Plaintiff's use of his hands was not affected by any impairment. *Id.* Dr. Bryan found Plaintiff could occasionally balance, but could never climb, stoop, crouch, kneel or crawl. (Tr. 454). He based this opinion on "multiple trauma with permanent x-ray changes." *Id.*

On November 27, 2007, Dr. Robert Dehgan, a board certified physician in rehabilitation, electrodiagnostic medicine, and spine and sports medicine, examined Plaintiff at the request of the Social Security administration for a disability evaluation. (Tr. 552-65). In his report, Dr. Dehgan noted Plaintiff "ambulates with a noticeable limp on the right using a cane in his left hand," and Plaintiff had "moderate discomfort getting in and out of the chair from the exam table." (Tr. 553). Dr. Dehgan found moderate tenderness and

guarding on the lumbar paraspinals; positive LaSague; and straight leg raising was 50 degrees on the right and 60 degrees on the left. *Id.* Dr. Dehgan noted generalized tenderness in the knees, moderate tenderness on the right hip and trochanteric area. (Tr. 555). Plaintiff complained of pain with range of motion on the left ankle and considerable pain with attempted range of motion of the right hip. *Id.* Dr. Dehgan noted decreased range of motion in Plaintiff's lumbar spine, hips, and knees. (Tr. 553, 555). Dr. Dehgan's impression was: degenerative arthritis of the right hip; lumbar radiculopathy[5]; status post fractured pelvis with internal fixation; and status post left tibia fibula with internal fixation. (Tr. 556). Dr. Dehgan concluded, "In my opinion based on the history, physical examination, review of records and information available he is not a candidate to return to work at this time. With proper management including work up for lumbar radiculopathy and total hip replacement he should be evaluated later for possibility of returning to gainful employment." *Id.*

Dr. Dehgan also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. 560-65). Dr. Dehgan found Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, and carry up to ten pounds occasionally. (Tr. 560). Plaintiff could sit one hour, stand thirty minutes, and walk twenty minutes at one time without interruption. (Tr. 561). Plaintiff could sit five hours; stand two hours; and walk one hour total in an eight-hour workday. *Id.* Plaintiff required the use of a cane to ambulate; could walk thirty to forty feet without a cane and carry small objects in

---

[5] Radiculopathy is defined as a disorder of the spinal nerve roots. *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 15, 2012).

his free cane.  *Id.*  Plaintiff could frequently reach, handle, finger, feel and push/pull with both hands.  (Tr. 562).  Plaintiff could never operate foot controls with his right foot, but could occasionally with his left foot.  *Id.*  Plaintiff could occasionally balance and stoop, but could never kneel, crouch, crawl, or climb stairs, ramps, ladders or scaffolds.  (Tr. 563).  Plaintiff could never be exposed to unprotected heights.  (Tr. 564).  Plaintiff could occasionally: move mechanical parts; operate a motor vehicle; and be exposed to humidity and wetness; dust, odors, fumes and pulmonary irritants; extreme cold and heat; and vibrations.  *Id.*  Dr. Dehgan also found Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces and could not travel without a companion for assistance.  (Tr. 565).

### ii. February 21, 2008 Hearing Testimony

Dr. Charles Hancock, a retired board certified orthopedic surgeon, testified via telephone at the administrative hearing held on February 21, 2008.  (Tr. 654-85).  Dr. Hancock stated Plaintiff "looks like he is doing pretty well" based on the medical records and the "medical evidence looks better than he is alleging that he is."  (Tr. 662).  Dr. Hancock stated Plaintiff had an injury to his ankle, and the x-rays of the ankle "look okay" with the joint space in the ankle well preserved.  *Id.*  Dr. Hancock noted the hip showed good clearance, meaning "the acetabular and the femoral head cartilage are in good condition."  *Id.*  Dr. Hancock noted Plaintiff had degenerative changes in the spine at L5-S1 and showed changes in the right sacroiliac joint.  *Id.*  Dr. Hancock noted the left tibia continued to show signs of healing, and the overall alignment looked good. (Tr. 663).  The pelvis showed good alignment with preserved acetabular joint space, and mild arthritic changes were reported in the hip joint.  *Id.*  Dr. Hancock stated the acetabular fracture was

getting along very well, but it may or may not cause him pain. *Id.* Dr. Hancock stated he did not find significant evidence of radiculopathy, and noted Plaintiff's reflexes were okay, and he did not have loss of musculature or atrophy. (Tr. 664).

Dr. Hancock testified Plaintiff did not meet or equal a listing, and noted Plaintiff was never established as having a nonunion that lasted over a year. *Id.* He said a sedentary RFC was reasonable. (Tr. 665). Dr. Hancock stated: Plaintiff could lift and carry up to ten pounds; Plaintiff was limited to standing and walking for two hours, and sitting for six; Plaintiff could push or pull no more than ten pounds; could climb ramps and stairs occasionally, but never ropes, scaffolds, or ladders; could frequently balance and stoop; and was limited to occasional crouching, kneeling and crawling. *Id.* Dr. Hancock stated "stooping would be all right because that's bending at the waist and [he] didn't have any significant injury." *Id.* Dr. Hancock found unlimited ability to reach, handle, finger and feel, and no visual or communicative limitations. (Tr. 666). Dr. Hancock stated Plaintiff should not be subjected to concentrated vibrations because of the metallic implant in his hip could be vibrated or shaken loose. *Id.* Dr. Hancock also stated Plaintiff should not be subjected to unprotected heights or dangerous machinery. *Id.*

The ALJ then asked Dr. Hancock if he believed Dr. Bryan's RFC – which stated Plaintiff could only occasionally balance, never stoop, crouch, kneel, climb or crawl – was wrong. (Tr. 667). Dr. Hancock agreed with the RFC as applied to Plaintiff "[e]arly on in the post injury state" but found "near the end of it when he was doing well and was ambulating, there's no reason that he should never do these things." *Id.* Dr. Hancock stated there was nothing in the record to support Plaintiff's "total inability to stand or walk or put pressure on it." (Tr. 668). Dr. Hancock stated he disagreed with limitations placed on Plaintiff by Dr.

14

Bryan and the SDM. "[I]f they could never stoop – stooping is bending at the waist which means that they could never bend over. They couldn't even put on their shoes or their socks because they couldn't bend at the waist. . . . Now I don't find in the evidence anything that support the inability of the Claimant to do those things." (Tr. 670-71). Dr. Hancock testified Plaintiff could ambulate effectively. (Tr. 681). Dr. Hancock stated the injuries Plaintiff received were capable of causing chronic pain, but should not be causing disabling pain, based on the evidence. (Tr. 684).

Plaintiff's wife, Cecelia Moten, also testified at the hearing. (Tr. 702-05). Ms. Moten testified Plaintiff has swollen legs, knees, and back problems. (Tr. 703). She stated he tosses and turns all night and it is hard for him to sleep. *Id.* She stated she puts his shoes and socks on for him and bathes him, because he cannot bend over. *Id.* She stated she cooks his meals and washes his clothes. *Id.* Ms. Moten testified Plaintiff is depressed, angry most of the time, and short-tempered. (Tr. 703-04).

Plaintiff testified he wears metal braces that have rods on both sides and velcro strapping that goes around them. (Tr. 680). Plaintiff testified he has severe torn ligaments in both knees. *Id.* Plaintiff testified he hurts in his lower back, hip, and knee. (Tr. 683). He cannot sleep at night because of constant severe pain and it feels like someone is squeezing his knees constantly. *Id.* Plaintiff stated he cannot get comfortable anywhere – sitting in a chair or lying in bed. *Id.* Plaintiff testified that his pain is at a nine out of ten most of the time. *Id.* Plaintiff stated his pain pills do not help, and he sits on a vibrating recliner chair at home. (Tr. 689). Plaintiff stated he is "on pins and needles" when he sits down and he cannot sit in a chair for six hours. (Tr. 690). Plaintiff stated he can sit one

hour to an hour and a half in an uncomfortable chair, and two to three hours in a reclining chair. (Tr. 691, 693). Plaintiff stated he can stand up to fifteen minutes, and can walk five minutes. *Id.* Plaintiff stated he cannot lift a gallon of milk while standing up. *Id.* Plaintiff stated he gets cramps in his right hand if he tries to do too much at one time, such as sorting papers or walking with his cane. (Tr. 692). Plaintiff stated he cannot bend over occasionally, and his wife puts and takes off his shoes, and washes him in the shower. *Id.* Plaintiff stated he can walk up three steps with his cane. *Id.* Plaintiff testified he has trouble sleeping, tosses and turns all night, and sleeps "here and there" for an hour or two at the most. (Tr. 693). Plaintiff stated he drives to his mother's house, and goes grocery shopping with his wife. (Tr. 694). Plaintiff stated his wife does all of the cooking and cleaning, and he does not do any housework. (Tr. 695). Plaintiff stated he takes medication for depression. (Tr. 696). Plaintiff testified his wife is with him at all times when he leaves the house, and he requires a companion. *Id.* Plaintiff testified he gets drowsy and takes little naps all day that last fifteen minutes to an hour. (Tr. 697). Plaintiff testified he keeps a urinal bottle by his chair and bed so that he does not have to get up to use the bathroom as often. (Tr. 697-98). Plaintiff stated his wife helps him get into and out of bed. (Tr. 698). Plaintiff stated he veers to the right when he walks, even with his knee braces and cane. (Tr. 700). Plaintiff testified he is unable to have sex with his wife. (Tr. 706).

A vocational expert ("VE") was present and testified at the hearing. The ALJ posed the following hypothetical to the VE:

> Let's assume that in the course of an eight-hour day, workday, the Claimant can sit up to six to eight hours. Can stand and walk to two hours. Can lift up to ten pounds occasionally. He can occasionally climb ramps and stairs. He can never climb any ropes, ladders, or scaffolds. Can occasionally balance,

kneel . . . crouch . . . crawl and stoop. . . . Unlimited manipulative limitations in reaching, handling, fingering, and feeling. . . . Unlimited visual and communicative limitations. . . . Unlimited in terms of his environmental limitations. So temperatures extremities, noise, dust. He cannot work in areas where he would be exposed to vibrations or would [sic] he would have to be ambulating on uneven terrain. Or he would not be able to work at unprotected heights or dangerous machinery.

(Tr. 709-11). In response, the VE testified Plaintiff could not return to his past relevant work. (Tr. 711). However, based on that RFC, the VE testified Plaintiff could perform the following sedentary jobs: (1) lens inserter, DOT 713.687-026; (2) surveillance systems monitor, DOT 379.367-010; (3) order clerk, DOT 209.567-014; and (4) document preparer, DOT 249.587-018. (Tr. 712-13). The VE testified Plaintiff could still perform those jobs if he had to use an assistive device when standing and walking, as long as he could lift up to ten pounds. (Tr. 713). The VE testified if Plaintiff was unable to do any crouching, kneeling, crawling, stooping or balancing, he would still be able to perform these jobs, because they are not considered factors for these positions. (Tr. 714-15, 720). The VE testified the lens inserter and document preparer jobs would be eliminated if Plaintiff had to alternate between sitting and standing, where he would have to move around for fifteen minutes after sitting for forty-five minutes. (Tr. 715).

## B. Summary of the ALJ's Decision

A plaintiff may be entitled to disability benefits under the Social Security Act if he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a five-step sequential evaluation process for

determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920;[6] *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520©. Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f). A plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

In the instant case, at step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since February 17, 2000, his alleged onset date. (Tr. 37). At step two, the ALJ found Plaintiff suffered from the following severe impairments: status post multiple lower limb fractures of the left leg; status post right hip fractures; status post right wrist fractures; status post open reduction, internal fixation of the tibia and fibula shaft fractures and of right ankle medial malleolus fracture; status post closed reduction of right

---

[6] All references made to 20 C.F.R. will be to the 2010 edition unless otherwise specified. As the Regulations for SSI disability payments mirror those set forth for DIB on the matters presented in this case, from this point forward the Court may refer only to those sections in 20 C.F.R. pertaining to part 404 and disability insurance benefits.

hip acetabulum fracture and of multiple disruptions of the pelvis. *Id.* At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404 Subpt. P. (Tr. 38). At step four, the ALJ found Plaintiff retained the residual functional capacity ("RFC")

> to lift and carry 10 pounds occasionally and 5 pounds of [sic] less on a more frequent basis, stand and/or walk up to 2 hours during an 8-hour workday and sit up to 6 hours during an 8-hour workday. He could occasionally climb ramps or stairs, balance, kneel, crouch, crawl, and stoop. He did not have any manipulative limitations or any communicative limitations. He could not be exposed to environments with vibration and could not ambulate on uneven terrain. He could not work at unprotected heights or around dangerous machinery. He could not climb ladders, ropes or scaffolds. It is therefore concluded that the claimant retains the residual functional capacity for a significant range of work at the sedentary level of exertion.[7]

*Id.* The ALJ found Plaintiff was unable to perform past relevant work. (Tr. 43). However, based on testimony from a vocational expert, the ALJ determined there were a substantial number of jobs in the national economy that Plaintiff could perform. (Tr. 43-44). The ALJ found that, based upon the ALJ's RFC, Plaintiff could perform the following jobs: (1) lens inserter, DOT 713.687-026; (2) surveillance systems monitor, DOT 379.367-010; (3) order clerk, DOT 209.567-014; and (4) document preparer, DOT 249.587-018. (Tr. 44). Therefore, the ALJ found Plaintiff was not under a disability from February 17, 2000, the alleged onset date, through the date of his decision. *Id.*

## III.  STANDARD OF REVIEW

The scope of this Court's review is generally limited to determining whether the ALJ

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the

evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, a plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove disabling physical or mental functional limitations. 20 C.F.R. § 404.704.

## IV. ANALYSIS

Plaintiff raises four arguments on appeal. First, Plaintiff argues the ALJ failed to give appropriate weight to the opinion evidence. Second, Plaintiff argues the ALJ failed to consider the side effects of Plaintiff's medications. Third, Plaintiff argues the ALJ's findings regarding Plaintiff's ability to stoop, the side effects of Plaintiff's medications, and depression are not supported by substantial evidence. Fourth, Plaintiff argues the ALJ's finding that Plaintiff did not meet a medical listing is not supported by substantial evidence. The Court will address each argument in turn.

**A. Whether the ALJ gave appropriate weight to the opinion evidence**

Plaintiff argues the ALJ failed to give appropriate weight to the opinions of Dr. Bryan, Dr. Dehgan, and Dr. Hancock.

### i. Dr. Bryan

Plaintiff argues the ALJ did not assign proper weight to Dr. Bryan's opinion that Plaintiff could "never" climb, stoop, crouch, kneel or crawl. Plaintiff argues a state consultant agreed with Dr. Bryan's opinion with regards to these limitations. Plaintiff also argues the ALJ misconstrued Dr. Bryan's opinion and his use of the word "sedentary."

The Regulations provide that, generally, more weight should be given to the opinion of a source who has examined a claimant than to the opinion of a non-examining source. 20 C.F.R. § 404.1527(d). The Regulations further instruct ALJs with respect to properly weighing the medical opinions of treating physicians. The Regulations provide, in pertinent part, as follows:

> Generally, we give more weight to opinions from [a plaintiff's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s)," a treating physician's medical opinion is due to be afforded great weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence in the record.  *Id.*  Important to the determination of whether there is a "detailed, longitudinal picture" of a claimant's impairments is the length of the treatment relationship,[8] the frequency of examination, the knowledge of the treating source as shown by the nature and extent of the treatment relationship, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and the specialization of the physician.  20 C.F.R. § 404.1527(d)(2)–(5).

In addition, it is well established in the Eleventh Circuit that, generally, substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is "good cause" to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The Eleventh Circuit has concluded "good cause" exists when a treating physician's opinion is: (1) not bolstered by the evidence; (2) contrary to the evidence; or (3) inconsistent with the treating physician's own medical records.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.  "Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court cannot "disturb the ALJ's refusal to give the opinion controlling weight."  *Carson v. Comm'r of Soc. Sec. Admin.*, 300 F. Appx. 741, 743 (11th Cir. 2008)

---

[8] Generally, the longer a treating source has treated a claimant and the more times a claimant has been seen by a treating source, the more weight that should be given to that source's medical opinion.  20 C.F.R. § 404.1527(d)(2)(I).

(citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)).[9]

In his opinion, the ALJ stated he gave considerable weight to the residual functional capacity completed by Plaintiff's treating orthopedic surgeon, Dr. Bryan, "insofar as it is consistent with the established residual functional capacity." (Tr. 41). The only inconsistency between Dr. Bryan's opinion and the RFC determined by the ALJ is Dr. Bryan found Plaintiff could never climb ramps or stairs, stoop, crouch, kneel or crawl, while the ALJ found Plaintiff could occasionally do these activities. Thus, although he did not specifically so state, the ALJ must be referring to this aspect of Dr. Bryan's opinion as not given considerable weight. Plaintiff specifically argues that the ALJ erred by failing to give credit to Dr. Bryan's limitation on stooping.[10]

The undersigned finds the ALJ did not "clearly articulate" his reasons for giving less weight to this aspect of Dr. Bryan's opinion. *Lewis*, 125 F.3d at 1440. As Plaintiff's treating physician, Dr. Bryan's opinion is entitled to great weight unless the ALJ finds good cause to discount it. The ALJ ultimately determined Plaintiff was capable of occasional stooping, contrary to his treating physician's opinion, but did not explain how or why he came to this conclusion. Following the statement that he gave "considerable weight" to Dr. Bryan's opinion "insofar as it is consistent with the established residual functional capacity," the ALJ began discussing medical reports and other evidence that supported his finding that

---

[9] Unpublished opinions may be cited throughout this order as persuasive on a particular point. The Court does not rely on unpublished opinions as precedent. Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 32.1, Fed. R. App. P. Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules. 11th Cir. R. 36-2.

[10] Stooping is defined as "to bend the body downward and forward by bending the spine at the waist." SSR 83-14.

Plaintiff was capable of sedentary work. However, there is an important difference in articulating the reasons why the ALJ believes Plaintiff is capable of sedentary work and articulating why he believes, contrary to Dr. Bryan's assertion, that Plaintiff is capable of occasional stooping.[11]

The question for the Court, then, is whether this error is harmless. "Harmless errors are those that do not affect the ALJ's determination that a claimant was not entitled to benefits." *Young v. Astrue*, No. 8:09-cv-1056-T-17TBM, 2010 WL 4340815, at *4 (M.D. Fla. Sept. 29, 2010) (citing *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990)).

SSR 96-9p states, "A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." SSR 96-9p. Contrary to Plaintiff's assertion, SSR 96-9p does not state that a person who is incapable of stooping will automatically be found incapable of sedentary work. Thus, an inability to stoop does not automatically require a finding of disability. A person may be incapable of stooping, but still capable of sedentary work, and vice versa. Rather, in recognition that the unskilled sedentary occupational basis is "significantly eroded," SSR 96-9 recommends the ALJ consult with a vocational expert in such cases to determine if there are sedentary jobs

---

[11] The ALJ noted later in his opinion that non-examining consultant, Dr. Hancock, found Plaintiff would not have any problems bending or stooping. (Tr. 42). However, with regards to Dr. Hancock's opinion, the ALJ stated he gave more weight to Dr. Hancock's opinion "as compared" to examining consultant, Dr. Dehgan. (Tr. 41). He never discussed Dr. Hancock's opinion in relation to Dr. Bryan. Moreover, for a non-examining consultant's opinion to be given greater weight than a treating physician's opinion, the ALJ must provide "good cause" to properly discount the treating physician's opinion.

available that the claimant can perform.  *Id.*

Here, any error in the ALJ's analysis of the weight to be given to Dr. Bryan's opinion regarding Plaintiff's ability to stoop is harmless because the ALJ met the Commissioner's burden at step five.  At step five, the ALJ is tasked with determining whether the claimant is capable of performing other work considering the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(f).  The ALJ met this burden with the assistance of vocational expert testimony.  The work identified by the VE, which a person with Plaintiff's characteristics could perform, encompasses positions which do not require stooping, according to the DOT.[12]  Thus, the ALJ met the step five burden, irrespective of the finding on Plaintiff's ability to stoop.  *See Turner v. Astrue*, No. 1:09-cv-867-SRW, 2010 WL 2619491, at *12 (M.D. Ala. June 30, 2010) (ALJ's failure to include limitation as to stooping in RFC was harmless error because jobs identified did not require stooping); *Luster v. Astrue*, No. 3:07-cv-533-J-TEM, 2008 WL 4371328, at *8 (M.D. Fla. Sept. 19, 2008) (ALJ's failure to determine whether Plaintiff could occasionally or never stoop was harmless because jobs identified by the VE did not require stooping).

Accordingly, even if the ALJ erred by discounting Dr. Bryan's opinion that Plaintiff could never stoop, the error did not have any impact on his step five determination that plaintiff can perform "other work."  Thus, the ALJ's decision that plaintiff is not disabled is still supported by substantial evidence.

_____

[12] See (1) lens inserter, DOT 713.687-026 (climbing, balancing, stooping, kneeling, crouching, and crawling "not present – activity or condition does not exist"); (2) surveillance systems monitor, DOT 379.367-010 (same); (3) order clerk, DOT 209.567-014 (same); and (4) document preparer, DOT 249.587-018 (same).  Further, the VE testified a hypothetical person could still perform several sedentary jobs even with the more restrictive limitations assessed by Dr. Bryan.

Finally, Plaintiff argues the ALJ misconstrued Dr. Bryan's opinion. Plaintiff argues "[t]he ALJ alleged Dr. Bryan's use of the word "sedentary' supports the ALJ's finding that he is able to perform sedentary work in Social Security terms." (Doc. #14, at 13). Plaintiff argues there is no evidence that Dr. Bryan intended to use Social Security terminology in his medical assessment. Plaintiff cites to SSR 96-5p, which states:

> From time-to-time, medical sources may provide opinions that an individual is limited to "sedentary work," "sedentary activity," "light work," or similar statements that appear to use the terms set out in our regulations and Rulings to describe exertional levels of maximum sustained work capability. Adjudicators must not assume that a medical source using terms such as "sedentary" and "light" is aware of our definitions of these terms.

SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. July 2, 1996).

Plaintiff is correct that the ALJ frequently cited to reports from Dr. Bryan stating Plaintiff could perform sedentary work. However, Dr. Bryan's mere use of the word "sedentary" was not the determinative factor in the ALJ's decision. The ALJ noted Dr. Bryan completed an RFC assessment which found Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally; could carry up to twenty pounds occasionally; could sit six hours, stand two hours and walk one hour in an eight-hour workday. (Tr. 41, 42, 452-55). These findings and limitations are consistent with sedentary work. *See* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."). Additionally, the ALJ noted the RFCs completed by a consulting DDS physician and consulting orthopedic surgeon Dr. Hancock contained limitations consistent with the ability to perform sedentary

work.  (Tr. 42, 429-37, 665-66).  Finally, the ALJ noted the RFC reached was "consistent with the claimant's own hearing testimony which noted the ability to sit for 1-2 hours at a time and lift and carry about ten pounds."  (Tr. 41).

Thus, the ALJ did not "misconstrue" Dr. Bryan's opinion that Plaintiff was capable of sedentary work or place undue emphasis on Dr. Bryan's use of the word "sedentary." Rather, the ALJ correctly relied on the limitations assessed by Plaintiff's treating physician, the consulting physicians, and Plaintiff's own testimony in determining Plaintiff was capable of sedentary work.  *Compare Anderson v. Barnhart*, No. C-01-2343-MMC, 2004 WL 725373, at *9 (N.D. Cal. Mar. 30, 2004) (ALJ erred in relying on consulting physician's statement that plaintiff could perform "light work" where physician "did not opine as to whether [plaintiff] was capable of 'standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday'"; however, the other consulting physician's conclusion that plaintiff could stand and sit for up to two hours at a time for six out of eight hours in a workday "could provide the substantial evidence necessary for a finding that [plaintiff] is capable of performing light work").

### ii. Drs. Dehgan and Hancock

Plaintiff argues the ALJ improperly rejected Dr. Dehgan's opinion and gave more weight to Dr. Hancock's opinion.  Plaintiff argues the ALJ applied incorrect legal standards to the opinion evidence, and Dr. Hancock is a non-examining doctor whose opinion is entitled to little weight.  Both Dr. Dehgan and Dr. Hancock are non-treating doctors.

Dr. Dehgan is a board certified specialist in rehabilitation, electrodiagnostic medicine, and spine and sports medicine, and acted as consulting, examining physician for

the Social Security Administration. (Tr. 553). Dr. Hancock is a retired board certified orthopedic surgeon, and acted as a consulting, non-examining physician for the Social Security Administration who testified at the administrative hearing. (Tr. 658-61). The ALJ discounted Dr. Dehgan's opinion that plaintiff "was not a candidate to return to work" because it was inconsistent with the opinion offered by Dr. Hancock. (Tr. 41). The ALJ stated he gave more weight to the opinion offered by Dr. Hancock because "he is a specialist in the field of orthopedics and has greater expertise in musculoskeletal impairments as compared to Dr. Dehgan." *Id.* The ALJ also noted Dr. Hancock "had the benefit of reviewing the entire medical exhibit file and was thus more familiar with his longitudinal medical history." *Id.* Finally, the ALJ noted the RFC reached by the ALJ was consistent with Plaintiff's own hearing testimony. *Id.*

The ALJ is required to evaluate every medical opinion he/she receives, regardless of the source. 20 C.F.R. § 404.1527(d). The ALJ is also required to "state with particularity the weight he gave the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir.1987) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986)). Pursuant to the regulations, the weight an ALJ must give medical opinions varies according to the relationship between the medical professional and the claimant. 20 C.F.R. § 404.1527(d); SSR 96-6p. "The opinions of examining physicians are generally given more weight than non-examining physicians; treating physicians receive more weight than nontreating physicians; and specialists on issues within their areas of expertise receive more weight than non-specialists." *Preston v. Astrue*, No. 2:09-cv-0485-SRW, 2010 WL 2465530, at *6 (M.D.Ala. June 15, 2010) (citing 20 C.F.R.

§ 404.1527(d)(1), (2), (5)).  In determining the weight given to a medical opinion, the ALJ must consider 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

The undersigned finds substantial evidence supports the weight afforded to the opinions of Dr. Dehgan and Dr. Hancock.  Dr. Dehgan's opinion that Plaintiff is unable to work is inconsistent with his own RFC assessment, as well as the record as a whole. *See* 20 C.F.R. § 404.1527(d)(3) (an opinion unsupported by objective medical findings is entitled to less weight).  Further, the ultimate decision of whether Plaintiff is capable to work is reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine you are disabled.").  Thus, the ALJ properly rejected Dr. Dehgan's statement. It was also proper for the ALJ to consider Dr. Hancock's specialty when determining the amount of weight to be given to the opinion evidence.  *See Preston*, 2010 WL 2465530, at *6 ("specialists on issues within their areas of expertise receive more weight than non-specialists"); 20 C.F.R. § 404.1527(d)(1), (2), (5).  Finally, the ALJ's finding that Plaintiff is capable of sedentary work is supported by the opinions of Plaintiff's treating physician (albeit with the one inconsistency previously discussed) and consulting physicians, Dr. Hancock and Dr. Shoemaker.

**B. Whether the ALJ properly considered the side effects of Plaintiff's medications**

Plaintiff argues the ALJ failed to consider the side effects of Plaintiff's medications, notably drowsiness and sleepiness. Plaintiff is on a number of medications, including Vioxx, Celebrex, Lortab, Ultram and Toradol (Tr. 159, 1163, 397-98, 548, 552). Plaintiff contends the ALJ erred by failing to elicit testimony at the administrative hearing regarding the effects of Plaintiff's medications and to make findings regarding the effects on his ability to work, citing *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981).

In *Cowart*, the plaintiff was not represented by counsel at the administrative hearing. *Id.* at 734. The Eleventh Circuit found plaintiff had not waived her right to counsel and "was prejudiced by the lack of counsel." *Id.* at 735. Because the right to representation had not been waived, the ALJ had a special duty to develop a full and fair record, which required him to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). The circuit court held the ALJ failed to discharge his special duty to develop the facts of the case and made no effort to elicit evidence favorable to plaintiff's claim. *Id.* One of the ways in which the ALJ failed to fully develop the record was he "neither elicited testimony nor made any findings regarding the effect of [plaintiff's] prescribed medications upon her ability to work." *Id.* at 737. The plaintiff had testified at the administrative hearing she was taking several medications that left her feeling "kind of zonked most of the time." *Id.*

The facts of *Cowart* are clearly distinguishable from the instant case, where Plaintiff was represented by counsel at the administrative hearing and the ALJ's obligation to develop a full and fair record had not risen to the level of a "special duty."

> Where a represented claimant raises a question as to the side effects of medications, but does not otherwise allege the side effects contribute to the alleged disability, we have determined the ALJ does not err in failing to inquire further into possible side effects. Further, if there is no evidence before the ALJ that a claimant is taking medication that cause side effects, the ALJ is not required to elicit testimony or make findings regarding the medications and their side effects.

*Burgin v. Comm'r of Soc. Sec.*, 420 Fed. Appx. 901, 904 (11th Cir. 2011) (internal citations and quotations omitted); *see also Passopulos v. Sullivan*, 976 F.2d 642, 648 (11th Cir. 1992) (holding plaintiff's argument that ALJ failed to elicit testimony and make findings on the effect of prescribed medications and their side effects to be "completely without merit" where ALJ did not have any evidence that medication caused side effects); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (holding where plaintiff did not complain about the side effects of medications, other than an isolated mention that one might be responsible for causing headaches, and where record did not disclose any doctor's concerns about side effects, substantial evidence supported the determination that the side effects did not present a significant problem); *Cherry v. Heckler*, 760 F.2d 1186, 1191 n.7 (11th Cir. 1985) (distinguishing *Cowart* where plaintiff was represented at hearing and did not alleged that side effects contributed to her disability other than a statement that her medication made her drowsy, and holding "the ALJ's failure to inquire further into possible side effects did not deprive her of a meaningful opportunity to be heard").

Plaintiff is correct that the ALJ must consider a claimant's subjective symptoms, including the effectiveness and side effects of any medications, when determining whether a claimant's impairments limit his ability to work. 20 C.F.R. § 404.1529(c)(3)(iv); *Walker v. Comm'r of Soc. Sec.*, 404 Fed. Appx. 362, 366 (11th Cir. 2010). However, as evidenced

above, the extent to which the ALJ must do so depends on the circumstances of the case. Moreover, while the ALJ has an obligation to develop a full and fair record, the burden remains on claimant to prove he is disabled, including introducing evidence supporting his claim that his symptoms (including any side effects from medication) make him unable to work. *Id.*

In the instant case, in response to a question by his attorney as to whether he gets drowsy, Plaintiff responded yes.[13] (Tr. 697). Plaintiff's attorney then asked if he gets drowsy enough to take rest periods during the day. *Id.* Plaintiff responded, "I don't know what you mean by drowsy. I take I would say little naps in and out all day. That's all I do. I'm not ever totally awoke [sic], I'm not really ever totally asleep." *Id.* Additionally, on disability reports submitted to the Social Security Administration on July 22, 2003 and July 30, 2003, Plaintiff reported his pain medication Vioxx caused drowsiness and sleepiness. (Tr. 159, 164).

Plaintiff did not specifically attribute his drowsiness to his medication at the hearing. (*See* Tr. 696-98). Because Plaintiff was represented at the hearing by counsel, the ALJ did not have a duty to inquire further into the alleged side effects of his medication. *See Cherry*, 760 F.2d at 1191 n.7. Plaintiff has also failed to point to any other evidence that supports his allegation that his medication caused work-related limitations. A mere statement by the plaintiff that a medication causes a side effect like drowsiness or headaches is insufficient to impose a duty upon an ALJ to elicit testimony and make

---

[13] It should be noted that Plaintiff's attorney did not specifically ask if Plaintiff's medication caused him to get drowsy, but only asked, "Do you get drowsy?" and "[D]o you get drowsy enough to take rest periods during the day?" (Tr. 697).

findings regarding the side effects of medication, particularly where, as here, the record does not disclose any doctor's concerns about side effects. *See Swindle*, 914 F.2d at 226; *Burgin*, 420 Fed. Appx. at 904; *Cherry*, 760 F.2d at 1191 n.7; *Passopulos*, 976 F.2d at 648. Nothing in Plaintiff's testimony or the medical record suggested that his drowsiness was severe enough to be disabling either alone or in combination with his other impairments.

Apart from his own subjective statements, there is no evidence in the record that Plaintiff's medications caused disabling symptoms. The ALJ found "[i]n light of the evidence of record, the claimant's testimony was not especially credible" and noted "[t]here were no signs of any confusion associated with pain or the side-effects of medication." (Tr. 42). Finally, the ALJ concluded Plaintiff's "allegations of pain and other symptomatology are disproportionate to the objective medical findings and are not credible beyond limiting the claimant as stated in the residual functional capacity assessment." *Id.* This finding encompassed Plaintiff's testimony about his drowsiness. *See Walker*, 404 Fed. Appx. at 367 ("The ALJ found that although [plaintiff's] medically determinable impairments could reasonably be expected to produce the symptoms she alleged, [plaintiff's] statements concerning the intensity, persistence and limiting effects of her symptoms were 'not entirely credible,' a finding that encompassed her testimony about her side effects.").

Accordingly, the undersigned finds the ALJ did not err in considering the side effects of Plaintiff's medications.

**C. Whether the ALJ properly considered Plaintiff's depression**[14]

Plaintiff argues the ALJ failed to include any limitations regarding Plaintiff's depression in his major findings and did not include any limitations regarding depression in the hypothetical to the VE.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhard*, 284 F.3d 1219, 1227 (11th Cir. 2002) (citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999)). Where the hypothetical employed with the VE does not fully assume all of the claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Pendley v. Heckler*, 767 F.2d 1561, 1561 (11th Cir. 1985). However, an ALJ is not required to include in a hypothetical question limitations that are not supported by the record or limitations the ALJ properly rejected. *Bouie v. Astrue*, 226 Fed. Appx. 892, 894 (11th Cir. 2007). Further, "[t]he ALJ is only required to pose those limitations he finds severe in the hypothetical to the expert." *Williams v. Astrue*, No. 5:06-cv-221/RS-AK, 2008 WL 222683, at *8 (N.D. Fla. Jan. 25, 2008).

Plaintiff is correct that the ALJ did not discuss depression in his opinion and the hypothetical posed by the ALJ to the VE did not include any limitations from depression. However, as stated previously, the ALJ is not required to include in the hypothetical

---

[14] In his brief, Plaintiff also argues the ALJ's findings regarding Plaintiff's ability to stoop and the side effects of Plaintiff's medications are not supported by substantial evidence. This is simply a retread of previous arguments the undersigned has already discussed in detail. Thus, the undersigned will focus on Plaintiff's argument that the ALJ erred in considering Plaintiff's depression.

limitations that are not supported by the record. *Id.* In the instant case, the ALJ did not find depression to be a severe impairment. (*See* Tr. 37). There is scant reference to depression in the medical record. During his initial application for disability benefits, Plaintiff did not allege depression, and specifically told his case worker he was not alleging any mental problems. (*see* Tr. 186). On August 23, 2007, Plaintiff reported to Family Medical and Dental Centers and complained of a depressed mood. (Tr. 424). He was educated about depression and given a one-month prescription for Cymbalta. (Tr. 425, 428). However, it is unclear whether Plaintiff ever filled the prescription because he reported to the Center two months later that he was not able to afford Cymbalta. (Tr. 568). It also does not appear that Plaintiff ever sought mental health treatment. Plaintiff's wife testified Plaintiff is in a depressed state, is angry most of the time, and short-tempered. (Tr. 703-04). Plaintiff testified at the administrative hearing that he currently takes pills for depression, but did not state what medication he is currently taking, and all of the medications listed in Plaintiff's brief are for pain treatment. (*see* Doc. #14, at 16).

The Eleventh Circuit has held that it is reversible error if the claimant presents a colorable claim of a mental impairment and the ALJ fails to comply with the regulations for evaluating mental impairments. *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005). Here, Plaintiff has not presented sufficient evidence to support a colorable claim of mental impairment beyond a one-time complaint to a medical professional of depression, and statements by him and his wife at the administrative hearing that he takes depression medication and is in a depressed state. *See* 20 C.F.R. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and

laboratory findings, not only by your statement of symptoms.").

Because Plaintiff has failed to provide evidence establishing a colorable claim of a mental impairment, the ALJ was not required to comply with the regulations for the evaluation of mental impairments. Nor was the ALJ required to mention Plaintiff's asserted mental impairment in the body of his decision, because no mental impairment that might effect Plaintiff's ability to perform work-related activities was found to exist, whether severe or not severe. *See Sesberry v. Astrue*, No. 3:08-cv-989-J-TEM, 2010 WL 653890, at *5 (M.D. Fla. Feb. 18, 2010) ("[T]he ALJ's silence regarding the two medical notations and Plaintiff's testimony regarding that he feels down is not error because this evidence, without more, does not establish a colorable claim of mental impairment.")*; see also Meadows v. Astrue,* No. 1:09-cv-2656-JFK, 2010 WL 3614157, at *6 (N.D. Ga. Sept. 7, 2010) ("Given the lack of mental health treatment and the fact that the record contains only two isolated notations of mental impairments, made by Plaintiff's primary case physician, the court finds that Plaintiff has not presented a colorable claim of mental impairment."); *Kellerman v. Astrue*, No. 5:08-cv-373-Oc-GRJ, 2009 WL 3586554, at *7 (M.D. Fla. Oct. 28, 2009) (Plaintiff failed to establish a colorable claim of mental impairment when only a single medical record related to the asserted depression and an anti-depressant was listed as a current medication).

Plaintiff's claim of a mental impairment is simply not supported by substantial evidence and the "isolated references [in the record] to Plaintiff's mental health are not enough to require the ALJ to address or develop the alleged mental disability." *Sesberry*, 2010 WL 653890, at *5. Accordingly, the ALJ did not err by failing to discuss Plaintiff's

alleged depression in his decision or to include any reference to depression in the hypothetical posed to the VE.

## D. Whether the ALJ's finding that Plaintiff does not meet a Listing is supported by substantial evidence

"To meet the requirement of a listing, [a claimant] must have a medically determination impairment(s) that satisfies all of the criteria of a listing." 20 C.F.R. § 404.1525(d). The claimant "must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart,* 284 F.3d 1219, 1224 (11th Cir. 2002). To "equal" a Listing, the medical findings must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). "If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment." *Wilson*, 284 F.3d at 1224.

Plaintiff argues he satisfies Listing 1.02A and should have been found disabled. The Regulations define Listing 1.02A as:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis[15] of the affected joint(s). With:

---

[15] Ankylosis is defined as the "stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion." *See* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=88261 (last visited February 15, 2012).

38

Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 CFR Pt. 404, Subpt. P, App. 1.   Thus, Listing 1.02A requires a claimant establish: (1) gross anatomical deformity of a joint (subluxation, contracture, bony or fibrous ankylosis, instability); (2) chronic joint pain; (3) stiffness; (4) signs of limitation of motion or other abnormal motion or other abnormal motion of the affected joint; (5) imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s); and (6) involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively.  *Id.*

1.00B(2)(b) explains what is meant by an inability to ambulate effectively.

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 CFR Pt. 404, Subpt. P, App. 1.

In his opinion, the ALJ found Plaintiff "did not have an impairment or combination of

impairments that met or medically equaled on of the listed impairments." (Tr. 38). In support of this conclusion, the ALJ explained,

> Sworn testimony from impartial medical expert and orthopedic surgeon, Dr. Charles Hancock revealed that the claimant's impairments did not meet or medically equal any of the listed impairments during the time period considered herein. The undersigned agrees and finds that the claimant has not satisfied the narrow definition of a listed impairment...nor do his impairments equal in severity a listed impairment.

(Tr. 38). At the administrative hearing, Dr. Hancock testified Plaintiff did not meet or equal any Listing, because he never had an established non-union of the leg bones that lasted over a year. (Tr. 664, 673, 675, 676).

Plaintiff cites to medical evidence that he has been diagnosed with continued pain and deformity in his left foot, marked and continued instability in his right knee, and has a documented inability to ambulate effectively. Defendant argues Plaintiff cannot establish he meets Listing 1.02A because he failed to cite, and the medical record does not reflect, imaging findings of joint space narrowing, bony destruction, or ankylosis in his knees, ankles, or hips. Defendant argues x-rays interpreted by Dr. Bryan showed the left ankle joint space was well preserved with mild arthritic changes (Tr. 357, 385); the right ankle had normal architecture with well preserved joint space (Tr. 374); the left and right knees had normal bony architecture with no abnormalities (Tr. 360, 373-74); and the hip joint space was well preserved with only mild arthritic changes (Tr. 365, 373, 382, 384). Additionally, an x-ray of Plaintiff's right hip in September 2005 showed no bony defects, fracture, or displacement. (Tr. 415).

A claimant's impairment must meet all of the specified medical criteria of a Listing, and "[a]n impairment that manifests only some of the criteria, no matter how severely, does

not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The burden is on Plaintiff to prove that he meets a Listing. *Bell v. Bowen*, 796 F.2d 1350, 1352 (11th Cir. 1986). In the instant case, Plaintiff has failed to cite to medical evidence showing "imaging of joint space narrowing, bony destruction, or ankylosis" of the hip, knee or ankle joints. 20 CFR Pt. 404, Subpt. P, App. 1. As noted by Defendant, the medical evidence supports the ALJ's finding that Plaintiff does not meet or equal Listing 1.02A, because Plaintiff's impairment does not meet *all* of the specified criteria of Listing 1.02A.

### V. CONCLUSION

Upon due consideration, the undersigned finds the decision of the Commissioner was decided according to proper legal standards and is supported by substantial evidence. Thus, the undersigned respectfully **RECOMMENDS the decision of the Commissioner be AFFIRMED**. The undersigned further recommends each party bear its own fees and costs, and the Clerk of the Court be directed to enter judgment consistent with this Report and Recommendation.

**DONE AND ENTERED** at Jacksonville, Florida this 16th day of February, 2012.

*Thomas E. Morris*

**THOMAS E. MORRIS**
United States Magistrate Judge

Copies to:
Hon. Roy B. Dalton
All counsel of record